IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


JOSE ALONSO GARCIA                                                    PLAINTIFF

        v.                          Civil No.   12-5037

OFFICER WRIGHT (#341),
Springdale Police Department;
and SERGEANT KIMER, Springdale
Police Department                                                    DEFENDANTS


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*  Plaintiff names as Defendants Springdale Police Officers

Derek Wright and Joshua Kirmer.[1]

The events at issue in this case occurred on January 28, 2012, and began when Officer

Wright attempted to stop a car being driven by the Plaintiff.  When the car came to a stop, Plaintiff

maintains excessive force was used against him.

On September 30, 2013, a hearing was held. Initially, the hearing was to be on Defendants'

motion for summary judgment.  On October 24, 2013, a supplemental telephonic hearing was held

to obtain the testimony of Kelsey Hull. During the supplemental hearing, the parties agreed that

all evidence had been presented and that the hearing should be considered an evidentiary hearing.

---

[1] Officer Kirmer's name was incorrectly spelled "Kimer" in Plaintiff's complaint.

AO72A
(Rev. 8/82)

### 1.  Background

At the September 30th hearing, the Court heard the testimony of the Plaintiff and both Defendants.  At the supplemental telephonic hearing, held on October 24th, the Court heard the testimony of Kelsey Hull.  Among the exhibits introduced were two dash cam videos from the Defendants' patrol cars.

***Jose Garcia***

Garcia is currently incarcerated in the East Arkansas Regional Unit of the Arkansas Department of Correction.  Garcia testified that on the date in question, Officers Kirmer and Wright stopped his car.  While Garcia was still in his car, he raised his hands.  He testified that the officer gave him some commands and also threatened to shoot him.  Garcia testified that he was scared and did not know if he should leave his hands up or open the door and get out of the car.  Garcia indicated that when he opened the door, he, by instinct, put his hands behind his head and went to the ground.  He was told to get up.

According to Garcia, Wright then pushed him towards the patrol unit.  Garcia testified that when they reached the patrol unit, he was pushed forward.  Garcia lost his balance when he was pushed.  Garcia testified that his foot went up when he was attempting to regain his balance.  While Garcia testified that he "guessed" he kicked Wright, he maintains he did not purposefully kick Wright.  Garcia states he was told by Wright that if he kicked him again Wright would put a hole in Garcia.

Garcia initially testified that Wright grabbed him around his neck and slammed him into the trunk of the patrol unit three times.  After being referred to his deposition, Garcia stated that his head hit the trunk once but that when two more attempts were made he pushed back against Wright.  Additionally, Garcia testified in his deposition that he was not slammed into the trunk.

-2-

Garcia indicated he was not handcuffed at this time but his hands were on the trunk.  Garcia testified that while this was occurring Wright repeatedly told him not to resist.  Garcia maintains that he was not resisting and his hands were on the patrol car.

Garcia testified that Kirmer came over, grabbed his wrist, and took him to the ground.  He maintained that once the handcuffs were put on him, the officers were still twisting his wrists.  Garcia testified that one of officers struck the left side of his neck, below the ear, three times.  He asserted that one of the Defendants placed a hand on his face so that he was unable to see which of the two Defendants struck him, but he believed it was Kirmer.  Garcia stated that he was also hit in the back.  Garcia testified that although he was not resisting during this entire time, he was being told not to resist.  Garcia states he was told the use of force was for "making us chase you f------ wetback."  Garcia testified that during this entire time he was screaming.

Garcia testified that when he was back standing, he asked Kirmer who had struck him and was told not to look at Kirmer.  He stated he was told they did what they wanted.

Garcia felt that there were two people on his back.  Garcia testified that he was being forcefully pushed into the ground.  Garcia estimated that he was on the ground about five minutes.  Garcia asserted that the use of force against him did not stop until other officers arrived and residents were coming out of their homes.  Garcia was put into one of the patrol cars.  Garcia estimated that the entire traffic stop lasted about fifty minutes.

Garcia testified that when he being transported to the Springdale Police Department (SPD), Garcia testified he asked the transport officer who had hit him.  The officer replied that he was the last on the scene and did not know what Garcia was talking about.

Garcia testified that approximately thirty minutes after he arrived at the SPD Wright came back and asked if he wanted to take a breathalyzer.  Garcia stated he did not.  However, once

-3-

AO72A
(Rev. 8/82)

Wright remarked that Garcia was making his job easier, Garcia indicated he wanted a breathalyzer. Wiright responded that Garcia had already messed up. Garcia testified that Wright continued to be verbally aggressive.

Garcia testified that when he stated he wanted to file a complaint or talk to a sergeant, his requests were refused. When he was booked into the Washington County Detention Center, Garcia submitted a grievance and was told the grievance procedure did not apply because the officers involved were not County employees.

Garcia testified that as a result of this incident, he sustained the following injuries: a knot on his neck; a knot on his forehead; bruising; and cuts to his wrists from wearing the handcuffs. Garcia also stated that he is now fearful that every officer might beat him.

Garcia testified that he did not report these injuries when he was booked in because he did not believe he needed medical attention, but he did put in a medical request the following day. See Defendants' Exhibit (hereinafter Defts' Ex.) 4. He was seen by the nurse two days after his arrest and by this time the knots had developed. It was determined that he had Hodgkins Lymphoma and this took the focus off the injuries resulting form his encounter with Wright and Kirmer. Garcia had surgery to remove the knots.

### *Officer Derek Wright*

Wright testified he had been assigned to the Crime Suppression Unit since August of 2010. There are five or six officers assigned to this Unit. The Unit's main focus is to target high crime areas between the hours of 3 p.m. and 1 a.m. The area where Garcia was pulled over is one of the worse areas involving gang activity and drugs.

The officers had information that narcotics were being sold from a house on Charles Street. Lieutenant Michael Lisenbee first spotted Plaintiff going into an area that had a cluster of narcotics

-4-

dealers. Lisenbee observed Garcia go into a house for five to ten minutes and then leave.  Wright testified he first saw Garcia at the intersection of Caudle and Powell.  Garcia stayed at the intersection for a period of time.  He turned west onto Caudle and then made a right turn onto Hill. Wright testified Garcia did not use a turn signal.

Wright testified that he activated his lights because he felt Garcia was trying to evade him. Garcia continued driving and made a right turn onto Harp.  Wright observed Garcia get very close to hitting a Blazer before he passed it.  Wright testified that at this point he put on his sirens. Lisenbee was in a patrol car behind him.

Wright testified that at Crutcher, Garcia ran the stop sign and drove all the way across the left lane.  Wright suspected Garcia was intoxicated because the turn did not make sense.  During the pursuit, Garcia ran a stop sign, crossed into the other lane and Wright thought Garcia was going to hit a car.  Wright observed a small bag being thrown out the window, and suspected that it contained drugs.  Garcia ended up in a cul-de-sac.  Wright testified he was very concerned that they were in a gang area.  Wright stated that there were three houses close enough to take "pot shots" at the officers.

Wright testified that he initiated a felony stop.  Wright acknowledged that he was not very polite and had his gun drawn when he made contact with Garcia, explaining that he had worked with gangs and drugs for two years and officers have to establish a commanding presence and not be timid in situations like this.  Wright indicated there is always some concern that the driver may be using the car door for concealment, so he directed Garcia to exit with his hands up.   When Garcia went to the ground, he was ordered to get up.  Wright testified the reason for this was to bring Garcia to the officers' safety zone--away from the car and the further away the better it was.

-5-

Wright stated his objective was to control the situation through voice commands. However, he also had his gun out and pointed at Garcia. Wright testified there was always the possibility that deadly force would need to be used.

Wright testified he grabbed Garcia's right wrist and pulled him behind the engine block for cover and concealment. Wright stated that you never let go of a suspect's hand once you have a hold of it. Wright testified that Garcia was pulling back and using his heels to resist. Wright used his hip and upper thigh as well as his weight to put Garcia against the patrol car. Garcia's heel them came up and hit Wright just about in the groin area. Wright still had control of Garcia's wrist. Wright had his foot between Garcia's legs.

Wright testified that Garcia was taken behind the engine block, which was out of view of the patrol car's dash cam, for safety reasons. Wright stated that if Garcia had been in the front hood area, Wright's back would have been to Garcia's car and its two occupants.

Wright testified that while it was possible that Garcia's head hit the patrol car, he did not see how it could have because the force Wright was using to hold Garcia against the patrol car was from the waist down. With the stance Wright was in, he did not believe Garcia could have hit his head on the patrol car.

Kirmer came up and took Garcia's right wrist. Wright testified he used his left arm to take control of Garcia's arm. Wright testified that Garcia was not complying and he was frustrated. Kirmer handcuffed Garcia. Wright asked if Kirmer had Garcia so that he could go and see who else was in the car.

Wright ordered the passengers to get out of the car one at a time. Wright testified that while he was occupied with Hull, one of the passengers, he heard Garcia screaming and turned and saw him on the ground behind Lisenbee. Kirmer instructed Garcia that when he stopped struggling

-6-

AO72A
(Rev. 8/82)

the pressure would stop.  Kirmer seemed to have control of Garcia.  To Wright, it looked like Kirmer was using a wrist lock on Garcia.  Wright saw Kirmer kneeling beside Garcia.

Wright testified that there were two female occupants of the car.  They were taken out of the car, handcuffed, quickly searched and then put in a patrol car.  Wright then went over by Kirmer.  Wright stated that he did not see Kirmer hitting or striking Garcia.  Wright testified he heard Kirmer telling Garcia to stop and saying if Garcia stopped he would stop.

### *Sergeant Joshua Kirmer*

Kirmer testified he had been with the police department for thirteen years and had occupied various positions. He had trained officers in defensive tactics and the use of force.

Kirmer testified that Wright put Garcia against the patrol car in reaction to his resistance. Wright was using balance displacement, trying to get control of Garcia.  Kirmer testified that  once Garcia was against the patrol car, he was easier to control.

Kirmer testified that in reviewing the SPD's use of force matrix, Garcia was using defensive resistance which would support the use of a chemical agent or a taser.  Defts' Ex. 3. When Wright believed he had been kicked, he could have considered Garcia to be an active aggressor, which allows an officer to use punches, kicks, forearm strikes, and vascular restraint. Id.

Kirmer testified that he arrived while Wright was still giving directions to Garcia to put his hands up.  Kirmer moved into a position to cover the passenger side of the car.  Kirmer did not have a good line of sight when Garcia exited the car.  Kirmer could see Garcia once he and Wright came behind the car.

Kirmer saw Wright had his hand on Garcia and Kirmer moved over to assist Wright in restraining Garcia.  Kirmer testified he heard Wright telling Garcia not to kick him again.  Kirmer

AO72A
(Rev. 8/82)

did not see Garcia kick Wright.  Kirmer considered Garcia to be actively resisting at that time.
Kirmer took control of Garcia's right side and Wright got control of the left side.  Kirmer then
handcuffed Garcia.

Wright went to take control of the other occupants of the car.  Kirmer testified he turned
Garcia around and took him towards Lisenbee's patrol car.  Garcia was back on his heels pushing
against Kirmer.  Kirmer testified that he was trying to search Garcia for weapons before putting
him in the patrol car, but Garcia was still resisting and pushing back with his heels.  Kirmer used
a compression escort to move Garcia to Lisenbee's patrol car.  This consists of putting one hand
on the suspect's hands and one just above the right elbow and pushing the two towards each other.
Kirmer testified that this hold hurts.  Garcia continued to resist and once they reached the patrol
car  Kirmer used the same hip maneuver Wright had used to hold Garcia against the patrol car.

Kirmer testified he did not feel he could restrain Garcia by himself so he used a controlled
descent to place Garcia on the ground.  Basically, a controlled descent is the act of helping
someone to the ground.  Kirmer testified he put his right hand between Garcia's shoulder and his
left hand on the biceps.  To make sure Garcia could not turn over, Kirmer moved his hands to the
right and left shoulders and pushed the two together.  Kirmer testified that this is a type of pain
compliance and it hurts more when the suspect is on the ground.  Specifically, it causes pain in the
back.  The next step would have been to use a taser.  Kirmer testified that at this time there were
only four officers on scene and the two passengers had not been searched yet.

Once Garcia was on the ground, he continued squirming and kicking.  Kirmer testified that
Garcia was screaming while Kirmer was putting pressure on his shoulders.  This would cause some
pain but Kirmer felt that Garcia's reaction was exaggerated.  Kirmer advised Garcia that if he
would "knock it off" that Kirmer would release the pressure.  Kirmer testified that Garcia

-8-

continued resisting for about three to five minutes, until Lisenbee and Stewart came to help. Lisenbee took control of Garcia's legs so that he could not kick, Garcia was searched on the ground, and Kirmer then released the pressure on Garcia's shoulders. When nothing was found, Lisenbee and Kirmer assisted Garcia in getting off the ground.

While Lisenbee's arrest report stated that Garcia complied with all instructions, Kirmer testified that prior to Lisenbee coming to assist, he would not have a good line of sight to see whether Garcia was being compliant. Kirmer testified that he did not punch Garcia at all and did not call him a derogatory name.

### *Kelsey Hull*

Hull testified she remembered the day in question. She was a passenger in Garcia's car. She believed she saw Garcia forced to the ground between the first and second police patrol car. Hull testified Garcia was not resisting. She indicated that an Asian officer punched Garcia. She testified that it looked like Garcia was in pain.

She testified that she looked back two or three times while being escorted from the Blazer to the patrol car. She heard a lot of screaming. She testified that once she was put in the back of the patrol car it was hard to see.

On cross-examination, Hull acknowledged that her testimony was somewhat inconsistent with previous statements she made to defense counsel when questioned about the events at issue. Hull explained that since then she has had time to sit and think about what had happened.

### *Dash Camera from Officer Wright's Patrol Car* (Defts' Ex. 7)

This video follows the car being driven by Garcia. In an apparent effort to avoid the traffic stop, Garcia goes through multiple stop signs, makes extremely wide turns resulting in the car being on the wrong side of the road on several turns, drives on the wrong side of the road, and

AO72A
(Rev. 8/82)

comes close to hitting parked cars and one car that he was passing.  Initially only the lights of the patrol car were activated.  However, after a couple of blocks, Wright turned on the siren.  The pursuit lasted approximately two and a half minutes.

When Garcia came to a stand still, Wright commands him to put his hands up and keep them up or Wright would shoot.  Garcia opens the door from the outside, steps out of the car, sets a drink down and gets on the ground.  Garcia is instructed to get up.

Garcia's right wrist is grabbed and he is pulled to the patrol car off screen to the left.  What occurs at that point cannot be seen.  There is some screaming and sounds of movement.  Wright can be heard telling Garcia not to kick him or he would put a hole in Garcia's head.

Screaming, moaning, and whimpering can be heard.  Wright instructs Garcia to calm down and informs him that he is under arrest.  A voice, presumably Garcia's, asks what is going on.

### *Dash Camera from Officer Lisenbee's Patrol car* (Defts' Ex. 6)

Lisenbee was behind Wright's patrol car.  Lisenbee can be heard reporting the direction and street names being taken by Garcia.  Garcia stops as he is on a dead end street.  Wright can clearly be heard telling Garcia to keep his hands up and step out of the vehicle. Wright repeats the instructions and threatens to put a hole in Garcia's head.

Garcia is told that he is under arrest and to stop resisting so he would not get hurt.  He is being commanded to do as he is told and not kick at the officers.  Neither Garcia nor Wright are in visual sight.  Screaming and what can be best described as whimpering can be heard as well as brief sounds of what could have been a scuffle.  Garcia was instructed again to calm down and follow instructions so that he would not get hurt.

There are two female passengers in Garcia's car.  They are removed one at a time and put in separate patrol cars.

-10-

*Audio Tape* (<u>Defts' Ex. 8</u>)

The audio tape contains the calls made by the officers involved in the pursuit to the dispatch.  Primarily it consists of the reporting of the direction and street names Garcia is taking.  There is also reference to something being thrown out of the car.

## II.  Discussion

"All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment."  <u>Winters v. Adams</u>, 254 F.3d 758, 764 (8th Cir. 2001)(citation omitted); <u>see also Henderson v. Munn</u>, 439 F.3d 497, 502 (8th Cir. 2006).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)(internal quotations omitted).  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  <u>Id</u>.

"Not every push or shove violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them."  <u>Rohrbough v. Hall</u>, 586 F.3d 582, 585 (8th Cir. 2009)(internal quotations and citations omitted).  "Objective reasonableness depends on the facts and circumstances of the case, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight."  <u>Id</u>. at pg. 586 (internal quotations and citations omitted).  This inquiry is made "without regard to [the

AO72A
(Rev. 8/82)

officers'] underlying intent or motivation." Nance v. Sammis, 586 F.3d 604, 609-10 (8th Cir. 2009).

After carefully considering the testimony and video evidence presented, I believe the only conclusion supported by the evidence is that Officers Wright and Kirmer acted reasonably under the facts and circumstances known to them.  It was almost 1:00 a.m. when the pursuit of Garcia began.  He was seen leaving a house that the officers believed was being used for the distribution of illegal drugs.  Garcia remained in the house for only a few minutes.  He was seen throwing something, suspected to be drugs, from the car.  Garcia did not pull over to the side of the road when Officer Wright activated his lights.  When Wright also turned on his sirens, Garcia continued to flee.  Garcia was driving erratically and it was suspected that he was under the influence of drugs.  To the extent Garcia's testimony differs from that shown on the dash cameras, the dash camera recordings are considered to resolve those issues.  Coker v. Arkansas State Police, 734 F.3d 838, 841 (8th Cir. 2013)(dash-camera recording properly used to resolve any factual disputes).

Once Garcia did stop fleeing, he failed to obey Wright's orders.  The encounter took place in a dangerous gang area and there were other passengers in Garcia's car who could have had weapons.

Although some physical force was used to ensure Garcia's compliance, I credit the testimony of Wright and Kirmer that only the amount of force needed to gain Garcia's compliance was used.  I also credit their testimony that Garcia was resisting their efforts.  Further, Garcia's testimony regarding the amount of force used was contradicted in important aspects by his deposition testimony.  In his deposition, he testified that when Wright attempted to push his head

-12-

into the trunk he was able to prevent it each time.  Defts' Ex. 2 at pg. 20. Garcia also testified that Wright "didn't push me that hard, I guess, because he didn't slam me."  Id. at pg. 21.

While Garcia states his movements were not the result of resistance but instead caused by the pain being inflicted on him, it was reasonable for the officers to attribute the continued movement as resistance.  Drugs and drug paraphernalia were found in the car.  Under these circumstances, the officers acted reasonably and no constitutional violation occurred.

Alternatively, Defendants argue they are entitled to qualified immunity.  "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  Hunter v. Bryant, 502 U.S. 224, 227 (1991)( quoting, Malley v. Briggs, 475 U.S. 335, 343, 341 (1986)).

 "Evaluating a claim of qualified immunity requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  Burton v. St. Louis Bd. of Police Com'rs, 731 F.3d 784, 791 (8th Cir. 2013)(internal quotation marks and citation omitted).  "The defendants are entitled to qualified immunity unless the answer to both of these questions is yes."  McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012).  The Court is free to decide which step it will decide first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

First, as discussed above, the facts shown by the Plaintiff do not make out the violation of a constitutional right.  The amount of force used was objectively reasonable under the

-13-

circumstances.  Johnson v. Carroll, 658 F.3d 819, 824 (8th Cir. 2011)(setting forth the applicable test).  The answer to the first prong of the inquiry is no.

Second, we determine whether the use of force violated a clearly established constitutional right.  "The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures."  Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. 386, 396 (1989).  The constitutional principles against excessive force that were clearly established at the time of the incident between the officers and the Plaintiff were such that no reasonable officer would believe his conduct under the particular circumstances of this case violated the clearly established law.  Thus, the answer to prong two is also no.  Defendants are therefore entitled to qualified immunity.

## III.  Conclusion

I therefore recommend that judgment be entered in the Defendants' favor and this case be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 13th day of December 2013.

/s/ Erin L. Setser
                    HON. ERIN L. SETSER
                    UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)